## SAMPLE v. PLATING & GALVANIZING CO.

### Nos. 1002 and 317.

District Court, D. New Hampshire.
April 5, 1939.

Conrad Snow, of Rochester, N. H., for Yankee Electroplate.

Ernest Bell, of Faulkner & Bell, all of Keene, N. H., and William Wesseler, Patent Atty., of Cleveland, Ohio, for Plating Co.

MORRIS, District Judge.

Two actions involving the same state of facts were tried together, one a civil action, jury waived, dated September 1, 1937, returnable at the Strafford County court the second Tuesday of February 1938 and removed to the Federal court March 18, 1938.

The other, an action in equity filed in this court March 19, 1938. The actions came on for trial at Littleton November 1, 1938.

The action at law is founded upon a contract for the sale of a process by the defendant for cadmium plating known as the "Camelyte Process," alleged to have been protected by an application for a patent December 11, 1936, a license for the practice of which was granted to Frank L. Sample, Jr., under date of February 17, 1937, who assigned the same to the Yankee Electro-

plate, Inc., a New Hampshire corporation organized February 25, 1937.

The action in equity is founded upon the same contract and concludes with a prayer for its rescission.

The defendant, The Plating & Galvanizing Company of Cleveland, Ohio, was organized in July 1936 and is a subsidiary of the Cleveland Chain & Manufacturing Company of the same city.

The cause of action is fraud in obtaining the contract of February 17, 1937:

The plaintiff alleges that:

1. "The said Plating & Galvanizing Company, by one Leroy Camel, its authorized agent and by other authorized officers and agents, did, in Boston, Massachusetts, and in said Cleveland, at divers times from and after, to wit, the First day of December, 1936, falsely and fraudulently represent to the said Frank L. Sample, Jr., and to the officers of the Yankee Electroplate, Inc., that certain samples of plated metallic objects then and there shown to him had been plated with and only with, a certain method and composition for cadmium plating, known as the Camelyte Process."

2. "That the aforesaid representations were made with knowledge of their falsity and with the intention that the said Frank L. Sample, Jr., should rely thereon."

3. "That the said Frank L. Sample, Jr., being ignorant of the falsity of said representations, and relying thereon, did enter into a certain contract or agreement with said Plating & Galvanizing Company, dated February 17, 1937, whereby the said Plating & Galvanizing Company as licensor granted to the said Frank L. Sample, Jr., as licensee, certain rights to use the said Camelyte Process in the jobbing plating business in the states of Maine, New Hampshire, Vermont, Rhode Island and Connecticut, and whereby the said Frank L. Sample, Jr., agreed to carry on said jobbing plating business, and to purchase all supplies necessary for its carrying on from the said Plating & Galvanizing Company."

The plaintiff asks for an assessment of damages and rescission of its contract.

The defendant's answer admits the licensing agreement or contract and the date thereof but denies the fraud and all other material allegations in the bill of complaint.

On April 18, 1938, the defendant filed an amendment setting forth a counter-claim and set-off which was allowed by the Court.

It alleged that Frank L. Sample, Jr., was guilty of fraud in obtaining the license agreement or contract February 17, 1937, in that he fraudulently represented to the defendant the size and scope of his proposed business and his ability to conduct and finance the same; that the defendant relied upon the false representations and gave the plaintiff the exclusive right to practice the process in the above mentioned states, and that the defendant was damaged by such false representations made by the plaintiff.

The defendant further alleges that the plaintiff was guilty of unfair trade practices by substituting improper materials and the negligent application and control of the same in practicing the process and failing to develop the territory granted in the licensing agreement or contract and representing to the trade that he was using the "Camelyte Process."

It is further alleged that the plaintiff is guilty of interfering with the defendant's business by hiring away one of its key employees and attempting to hire away others.

The defendant further alleges, in the nature of a set-off, that the plaintiff is indebted to the defendant for money paid out at the plaintiff's request and for goods and merchandise purchased in the sum of $1826.32, which, though demanded, the plaintiff refuses to pay.

Issues were joined on the several allegations in the plaintiff's declaration and defendant's counter-claim and set-off. The trial lasted three weeks resulting in more than 600 pages of transcript and about 150 exhibits.

## FINDINGS OF FACT.
### Historical.

Frank L. Sample, Jr., is twenty eight years of age and his only business experience has been in connection with the Rochester Brass Corporation located in Rochester, N. H., of which he was president. He became interested in the subject-matter of this suit sometime in 1936 when he saw some work at the plant of Thomas Laughlin & Son in Portland, Maine, plated with the Camelyte Process. He was informed that the work was done by the Cleveland Chain & Manufacturing Company of Cleveland and he arranged a meeting with their Mr. Leroy Camel in Boston to discuss Camelyte plating and the possibility of a new corporation to be organized by himself to purchase the New England

rights for that process. Camel represented that Camelyte was a secret process, entirely different from any other plating process on the market; that it was very bright and could be used on any type of metal; that it could compete with chrome plating and was much cheaper. He mentioned some of the elements he was experimenting with particularly molybdenum, beryllium, silver and cobalt. Nothing was said at the conference in Boston about Camelyte being a patented process. As a result of this conference and further negotiations a corporation known as the Yankee Electroplate, Inc., was organized on February 25, 1937, under the laws of the State of New Hampshire.

### Cleveland Chain & Manufacturing Co.

The Cleveland Chain & Manufacturing Company is an old established corporation doing business at Cleveland, Ohio. It is engaged in the manufacture of all kinds of chains and Leroy Camel was its chemist who developed the Camelyte Process.

The Camelyte Process was first used by the Chain Company in connection with its own business but later, in July 1936, a subsidiary corporation was formed known as the Plating & Galvanizing Company, the defendant in this suit, to carry on the business of plating and galvanizing for the Cleveland Chain & Manufacturing Company.

On December 12, 1936, Frank L. Sample, Jr., visited the plant of the Plating & Galvanizing Company in Cleveland where he met the officers of the Company and saw the Camelyte Process in operation and obtained samples of the work. He was also given the names of customers who were using materials said to be plated with Camelyte Process. The question of a contract for the New England rights was discussed but no agreement was reached. Sample took with him to Cleveland a floor plan of the section of his building which he intended to use in his operations and Mr. Camel drew a diagram of a prospective layout of the necessary equipment for producing Camelyte plating.

I am satisfied that neither nickel or tin was mentioned at the conference in Boston but when Sample was in Cleveland he was shown articles plated with different materials including nickel, tin, silver, manganese and copper.

There was considerable correspondence between the parties prior to the signing of the agreement on February 17, 1937. In a letter dated December 26, 1936, Sample, Jr., represented to the defendant company that the Rochester Brass Corporation had been in the plating business since its inception and had "built up a rather satisfactory list of customers in that field." He further stated "it is our intention to organize a new firm entirely separate, financially, from the Rochester Brass Corporation." He stated that he was willing to go into the business only as a major operation and urged that he have a franchise for the New England states. In another letter written by Sample, Jr., to Camel on January 26, 1937, the question was asked, "How does Grasselli Cadalyte compare with Camelyte, that is, is it similar, is it as bright and does it stand up as well?" This question was never answered. Other letters passed between the parties, Sample, Jr., on his part urging haste with reference to details of the plant and excuses on the part of the defendant that it had suffered heavy flood damages and consequent delay but finally on January 28, 1937, a tentative copy of an agreement was forwarded to the plaintiff and after some correspondence a final draft was signed February 17, 1937.

### License Agreement.

The agreement appears to have been made between the Plating & Galvanizing Company, licensor, and Frank L. Sample, Jr., licensee, two days prior to the first meeting of the Yankee Electroplate, Inc.

It recites that the Licensor is the sole and exclusive owner of an application for Letters Patent of the United States filed by Leroy Camel, relating to method and composition for Cadmium plating; that the Licensee is desirous of acquiring the right to the exclusive use of said invention in so far as it relates to the jobbing plating business in the New England states; that the Licensor grants such exclusive right for the New England states with the exception of Connecticut and Rhode Island and in the two last mentioned states in so far as the same does not conflict with the business of the Bridgeport Chain & Manufacturing Company, and that in the event of conflict between the right of said Licensee with the business of the Bridgeport Chain & Manufacturing Company, the Licensee will withdraw from the business to the extent to which the same is found to be in conflict with the business of said company. The Licensor grants to the Licensee the right to assign the rights herein granted to the suc-

cessor to his entire business, but no other assignment shall be made of the rights herein granted without the written consent of the Licensor.

The agreement was to continue for the term of two years with the right of extension or cancellation by either party, after the expiration of the two years, upon sixty days written notice. The Licensee agreed to obtain all supplies necessary for the carrying on of said jobbing plating business from the Licensor in accordance with a schedule of prices herein agreed upon and annexed, or such substitute schedule as may be mutually agreed upon by the parties in writing.

The Licensee agrees to make an initial payment of $500 as a license fee for the right to practice the Camelyte Process. The Licensor agrees to protect the Licensee from unlicensed infringing competition within the territory hereinunder licensed through the control of the supplies of material for use in connection with such jobbing plating business and upon the granting of patents in connection with the pending patent application hereinafter described.

According to the correspondence between the parties the plaintiff on February 1937 began clearing out the floor for the installation of the necessary equipment for carrying on the plating business. On April 1, 1937, Sample, Jr., wrote the Plating & Galvanizing Company that he had both barrel machines set up and ready to do business upon the arrival of the solution from the defendant's plant in Cleveland. The equipment was installed in accordance with defendant's floor plan but they did not recommend any heating equipment but the plant was connected up with steam power from another part of the building. A small shipment of solution was received March 20, but not enough to carry on the business commercially.

The plaintiff appears to have had considerable difficulty in obtaining cadmium anodes on account of the scarcity in the market. As early as March 9, 1937, the defendant wrote the plaintiff that owing to the shortage of cadmium anodes the plaintiff should purchase all that he could locally but promising assistance to help out if they had any to spare.

On March 30, 1937, plaintiff wrote the Plating Company as follows: "in reference to your letter of March 9, in reference to our endeavoring to obtain cadmium locally. We take this to be your permission for us to obtain temporary supplies of cadmium from other sources than the Plating & Galvanizing Company. Our contract with you provides, Paragraph 7, that purchase of supplies necessary for the carrying on of the jobbing and plating business, should be purchased from you, and we do not want to, in any way, do anything contrary to the terms of our contract without your specific permission. This authority you gave us to purchase supplies elsewhere we are accepting without prejudice to our rights under the contract."

On June 28, 1937, Louis D. Cull, an officer of the Plating Company, wrote the defendant as follows: "Your letter of March 30th was received while the writer was away on a sixty day trip and therefore not brought to his attention. It indicates that you were of the opinion that cadmium was to be obtained from us under the terms of our agreement, and particularly Paragraph 7, which states: 'The licensee shall obtain all supplies necessary for carrying on said jobbing and plating business, from the Licensor.' So that there may be no further misunderstanding on this point, we hasten to advise you that all negotiations leading up to the agreement was understood by both Mr. Frank L. Sample, Jr., and ourselves to be based on us supplying the secret chemicals only and there was no obligation or desire on our part to furnish the cadmium, which we do not manufacture and which is a standard commercial article. Not alone was this understood verbally, but in our letter of January 28th we explained that, paragraph 7, of course is understood to mean, either the chemicals in powder form or in liquid form which are necessary for camelyting and which are covered by our secret process."

I find that reference to the letter above referred to confirms Cull's statement. Yet the plaintiff in a letter dated July 1, 1937, takes issue with Mr. Cull's statement and further complains because of their failure to furnish cadmium anodes they lost considerable business and were forced to operate at a loss on other jobs. Apparently considerable friction between the parties was created because of the different interpretations with respect to "paragraph 7" of the agreement but the plaintiff winds up his letter of July 1, by saying, "We are determined to make Camelyting plating process a success here in the east and we only want your best in the way of support and patience."

Exhibit 68 consists of twelve letters from either prospective customers or concerns for whom the Yankee Electroplate had done work expressing dissatisfaction to the Camelyte process plating. These letters extend over a period from May 10, to July 26, 1937.

It is apparent from this correspondence and other evidence in the case that the Yankee Electroplate, Inc., was not meeting success in its business.

When the Yankee Electroplate, Inc., was ready for operation it engaged the services of a man by the name of Blanchard as superintendent who was recommended as a person experienced in the plating industry. On April 6, 1937, plaintiff wrote defendant that, "Blanchard was having a little trouble plating. It seems that whiskery effect is still with him and on polished work it shows up a little bit cloudy, although this can easily be rubbed off. Will you advise us what you think the difficulty is."

In reply Mr. Camel wrote the plaintiff that he thought their Mr. Blanchard could work himself out of this trouble and if not to advise him.

As early as May 22, 1937, the plaintiff was becoming dissatisfied with Blanchard and offered the position to Camel which was not accepted by him. This is shown in a letter written on the above date by the plaintiff to Camel which follows:

"Evidently you are not considering the position we offered you here, for reasons best known to yourself, though, frankly, we did expect an acknowledgment from you. Blanchard is definitely not the man we want here, not only from a standpoint of plating ability, but primarily, from the standpoint of ability to get the most out of the men working under him. We want to hire the best men that we can get and we, therefore, ask you if you can recommend someone who would be competent to handle our plating shop?

"We don't intend, of course, to stay only in Camelyte, but we are now obtaining preliminary figures and costs on installing copper, bright nickel and chrome tanks and we, also, need someone who is competent to control a bright zinc solution both in still tank and barrel. We will very likely buy one or more LaSalco units for bright zinc."

In answer to the above inquiry the defendant wrote to the plaintiff recommending a man who had been with the defendant company for about eight years and understood the plating business thoroughly. However, the man referred to was not hired but after a series of correspondence of which the defendant had notice, its plant superintendent, Kent Shockley was hired and commenced work on or about July 22, 1937.

On June 23, 1937, the chemical content of Camelyte solution became a matter of discussion between the defendant and the plaintiff. In a letter dated June 23, 1937, the defendant wrote the plaintiff that:

"During a recent visit to our plant you showed me a report from the University of New Hampshire, covering the analysis of a Camelyte coating on a piece of steel. The report showed a deposit of nickel combined with Cadmium. As a result of this analysis I told you that this could not be Camelyte plated, because of the fact that Camelyte solutions contain absolutely no nickel in any form.

"Out of my own curiosity, I analysed a sample of your plating solution and discovered to my surprise, large quantities of nickel.

"The presence of nickel, either as an impurity in your anode or introduced into your bath in the form of a nickel compound, is an infringement of a patent now in force. I suggest that you immediately remove this nickel from your bath. After this is done kindly send us a large sample of your solution for analysis.

"How do you explain the presence of this metallic nickel in your solution?"

Following this letter the plaintiff sent to the New Hampshire University three samples of plating solution for a complete analysis and especially for the presence of nickel. On July 10, a return of the analysis was made showing no trace of nickel in the samples but a slight trace of cobalt as an impurity.

On July 12, 1937, the plaintiff wrote the defendant that they were having an analysis made to determine the nickel content and stated that they could not account for the presence of nickel, *and we do not want it there if it is not in conformity with genuine Camelyte solution.*

As early as May 10, 1937, Camel informed the plaintiff, while he was in Rochester that a characteristic feature of Camelyte was its tin content. On July 13th, the plaintiff wrote the defendant regarding the tin content of the solution and asking what they were supposed to do to replace the tin

in the solution. The defendant replied by saying, "Every time you make an addition of brightener to your bath you are also making an addition of tin. The compounds in your brightener when they are supplied to you, contain tin in the quantity necessary to maintain your bath."

Insofar as I am able to discover, it was on or about May 10, 1937, that the plaintiff first learned that one of the component parts of the secret solution called Camelyte was tin. Before that date the plaintiff did not know what Camelyte contained. After it found that tin was used as a brightener in the secret solution it continued to accept and use the same, making no protest that it had been misled into believing that the bright lustre of Camelyte plating was due to the presence of nickel.

The defendant began shipping to the plaintiff plating solution in March 1937. The earliest item shown on the accounts is dated March 13, 1937, for 500 pounds of Camelyte plating salts, $437.50. Several letters requesting payment of this article were sent to the plaintiff. It was finally paid in response to a letter of June 23, from the Plating & Galvanizing Company. Shipments continued from time to time until bills were contracted amounting to $1826.32 which have never been paid.

Numerous letters calling attention to the overdue bills were sent the plaintiff on June 9, June 23, July 8 and July 23, 1937. On October 14, 1937, Mr. Cull wrote a very sharp letter calling attention to the balance due, $1826.32 and insisting that if business relations were to continue, plaintiff's overdue account must be paid. The letter states: "We are wondering whether you care to continue the pleasant relationship which has been existing between your company and ours and whether you wish to retain license right for Camelyting. Naturally you cannot expect us to continue to protect you in your territory unless you live up to your part of the understanding and take care of charges for material supplied you. For our part we have no desire to cancel the agreement unless requested by you or unless it becomes necessary through your noncompliance. In particular what we have in mind now is our account amounting to $1826.32 dating back to April 3rd which is still unpaid. We have now obtained our patent covering Camelyte and so your position and our position in this respect, is much stronger then when you first took over the franchise. Naturally, if you do not take care of it we shall have to handle it the same as we do any other overdue account on which we have exhausted our own collection efforts."

On October 27, 1937, the plaintiff wrote a letter to the defendant in which he stated: "Your letter of October 11th received. We must refuse to pay this bill."

As early as August 3, the plaintiff, when payment of the defendant's bill was requested, began complaining about the interpretation of the contract, particularly with reference to being furnished cadmium anodes and requested that a representative of the defendant come to Rochester to discuss the account and the agreement. After some further correspondence and receipt of the letter of October 27, Mr. Cull, on or about November 15, made a trip to Rochester, where, instead of discussing the contract and the account, service of the writ in this suit was made upon him. It is apparent that the invitation to visit Rochester to discuss the agreement was a subterfuge on the part of the plaintiff to obtain service on the defendant in this jurisdiction.

## PATENTS.

On August 21, 1928, the Grasseli Chemical Company of Cleveland, Ohio, through the application of Leon R. Westbrook, filed November 23, 1926, obtained a patent for a process and composition of cadmium plating. U.S.Patent No.1,681,509.

The object of the invention was to provide a method of electroplating cadmium "in the form of bright, hard, dense and smooth deposits" at current densities up to 80 amperes per square foot. The invention was based on the discovery of the fact that this object could be attained under the influence of small amounts of certain metals, and particularly of nickel, in a cadmium cyanide plating bath.

Later, by application of Mr. Westbrook dated July 11, 1927, and granted October 6, 1931 (U.S.Patent No. 1,826,159), protection was enlarged to cover the use of sulfonated vegetable oils and particularly of Turkey red oil or sulfonated castor oil (or turkon oil), as an organic compound, which had been found "to produce platings which are smoother, denser and brighter than any other cadmium plates so far known," especially when used with alkaline cadmium cyanide baths containing small amounts of nickel salts as described in patent No. 1,681,509.

Prior to July 28, 1934 these patents were assigned to E. I. Dupont de Nemours Co., of Wilmington, Delaware. They were used to manufacture a plating composition known as "Cadalyte", a trade name applied as early as 1925.

Prior to the assignment of the patents to Dupont, on June 8, 1932, the Cleveland Chain & Manufacturing Company, secured of the Grasselli Chemical Company, "an indivisible, non-assignable, non-exclusive license to use Cadalyte at its plants" in Cleveland, "and nowhere else". This it continued to do up to the time that the Plating & Galvanizing Company was formed in July 1936 and by the latter company thereafter.

The plating material, Cadalyte, was purchased from the Dupont company after its acquisition of the title, already mixed either in solution or in powdered form.

While throughout the testimony the term "Cadalyte Process" is used, I do not understand that the patents were process patents but only covered the ingredients entering into Cadalyte. The same may be said with reference to Camelyte hereinafter described.

## CAMELYTE.

Leroy Camel, chemist for the Cleveland Chain & Manufacturing Company and later for the Plating & Galvanizing Company, testified that he became acquainted with the use of Cadalyte back in 1928 or 1929 and that it produced a smooth, dull finish; that while working for the Cleveland Chain & Manufacturing Company in 1932, he began experimenting with different materials for the purpose of obtaining a smooth, bright deposit and to give greater ductility. He named as the basic element cadmium with other elements as an alloy such as silver, nickel, cobalt, tin, copper and others. He claimed to have reached his goal by the use of silver, nickel and tin and gave the tradename to the process and composition of "Camelyte." He claimed to have been using the Camelyte solution bath for at least three years prior to the formation of the Plating & Galvanizing Company. He testified that the Camelyte solution was a cadmium nickel bath which differed from Cadalyte in that it produced a very bright finish. While using a cadmium nickel solution he continued his experiments with tin as an alloy.

In the latter part of 1936 Camel called upon William J. Wesseler, a patent attorney, who seemed to entertain the thought at first that he could apply for a comprehensive patent covering cadmium plating embodying cadmium silver and cadmium tin and that the term "cadmium" meant a bright process for plating. After examining the claims he advised that it would be much easier to obtain a patent for cadmium silver than for cadmium nickel plating.

He testified that the cadmium silver application was filed on December 11, 1936, in place of the general application. This is the application that was abandoned and the application for cadmium tin was filed April 1, 1937.

I do not find that any application for cadmium nickel plating was made, so that the word "Camelyte", so far as the evidence discloses, has come to mean a plating solution which put through the ordinary process of plating gives a smooth, bright finish when properly handled.

The invention is described as "the process of electrolytically coating a ferrous article with cadmium in an alkali cyanide solution." The application contained twelve claims. An examination of the file wrapper shows that all but two of the claims were rejected by the patent office.

On March 4, 1937, the Plating & Galvanizing Company received definite notice from the Dupont Company that Camelyte was an infringement on its Westbrook Patent 1,-681,509 and Westbrook Patent 1,826,159 covering Cadalyte.

As a result of this letter and further correspondence and visits to the Cleveland plant by Dupont representatives Mr. T. E. Round and Mr. Camel, on April 23, 1937, visited the Dupont plant in Wilmington and agreed to replace all the so-called Camelyte baths which were infringing the Dupont patents with a new bath which did not infringe.

The new solution which the Plating & Galvanizing Company developed did not contain nickel or Turkey Red oil. I find that it did contain sodium cyanide, cadmium oxide and tin salts.

On April 1, 1937, the defendant filed an application for a patent on a so-called cadmium tin solution which was granted September 14, 1937. This is the patent which was referred to in Mr. Cull's letter to the Yankee Electroplate, Inc., dated October 14, 1937. This patent covers "a new article of manufacture, a metal article having an electrolytic coating comprising an alloy of cadmium and tin. It is claimed that it pro-

duced a smooth, bright plate comparable to any other on the market if an excess of tin is not used. It was this excess of tin and the fact that the tin was consumed in the plating process that resulted in a series of letters between the parties.

## CONCLUSIONS.

It is evident that Frank L. Sample, Jr., after he saw the sample of bright plating at the McLaughlin plant conceived the idea of securing the right to do that kind of work at his plant in Rochester. Upon being told that the sample was plated by the Cleveland Chain Company he wrote to that company seeking information. As far as I am able to ascertain this first letter was never answered. Upon further inquiry from the Portland company he ascertained that Mr. Camel of the Cleveland Chain Company was to be in the east sometime in December and Sample contacted him at the Bradford Hotel in Boston where they had a conference. Sample indicated his desire to secure a franchise for doing the kind of plating he had seen at the McLaughlin plant. He told Camel he wished to secure a process that would result in a bright lustrous plate. I have no doubt that Camel, who was an inventor, was enthusiastic with reference to his invention which he called Camelyte.

I find that Camel had for some time been experimenting at the Cleveland plant with cadmium anodes in conjunction with other substances in an effort to obtain a bright lustrous plating product. He mentioned several combinations that he was experimenting with and the fact that the matter had been taken up with a patent attorney in an effort to secure a patent on some of these combinations. He did represent that he had found a secret process which would accomplish the desired result and which would be cheaper than any other plating process on the market.

He did not disclose the combination of elements included in his invention but called the process "Camelyte." He did not even disclose the secret of the process to his employers but kept the same locked in his safety deposit box.

That Sample was enthusiastic in the matter is shown by the fact that soon after the conference in Boston December 1936, he visited the Cleveland plant of the defendant, had a conference with the officers and saw the plant in operation. He was shown various samples of plating done with Camelyte Process and expressed himself pleased with the appearance of the various articles and remarked "any of these are good enough for me." His enthusiasm was further exhibited by the fact that he took with him to the Cleveland plant a floor plan of a part of his building where he proposed to set up his plating business. Camel made a draft on the plan of the necessary set-up for installing the proposed plating process.

After considerable correspondence in which Sample desired to obtain the New England franchise and representing that he could obtain ample financial backing the contract was signed February 17, 1937. This agreement or contract refers to an application for a patent relating to a method and composition for cadmium plating.

The reference in the agreement to a patent application must refer to the combination of cadmium and silver because that was the only patent application that had been made at the time the contract was signed.

I find that the name "Camelyte Process", as used in the testimony and negotiations connotes a process of adding to ordinary cadmium plate an alloy designated as a brightener which will result in giving a bright lustre to the article. The substances that Camel had used and adopted in his experiments were silver, nickel and tin.

As disclosed by the testimony and the exhibits there appears to be very little difference in the appearance of the articles plated by use of the different alloys if the work is done by an experienced plater.

Sample, Jr., did not know the secret process claimed by Camel to have been invented and, therefore, could not have been in any way misled by any representations made to him concerning same. After he had installed his plant in Rochester and engaged the services of Blanchard as foreman, he had trouble in obtaining cadmium anodes and attempted to secure the same from the Cleveland plant claiming that it was its duty to furnish it under paragraph 7 of the agreement. He was advised of a scarcity of the material due to the flooding of the mines and advised to purchase the same locally wherever obtainable. The difficulty of obtaining cadmium and the failure of the defendant to furnish it is set up as one of the grounds resulting in loss of business.

I find that their failure to secure business did not result from not being able to

secure cadmium from the defendant, but was due to insufficient financial backing, inexperience in the plating business and incompetency of their foreman Blanchard.

Prior to any of the negotiations with Sample or the Yankee Electroplate, Inc., the Cleveland Chain & Manufacturing Company were using for their plating process, cadmium combined with nickel and other substances called Cadalyte, a patent for which had been granted to the Grasselli Company. This they had a license to use in their own plants but they did not have a license.to use the same and call it "Camelyte". Camel claimed that he did not know the content of Cadalyte but I am satisfied that, with his numerous experiments, he must have learned that it was a combination of nickel and other·elements and that it was a patented process. He may have experimented, as he testified, with different combinations of nickel and other elements in an effort to obtain a patentable process, but the fact that he never applied for any patent, shows that he had never been successful in so modifying the Cadalyte combination as to make it patentable under the name of Camelyte. In fact his combination of cadmium with silver was not successful as all but two of his several claims were rejected by the patent office and while the file wrapper shows a modification of several of the claims the application has not been pressed and on April 1, 1926, the application of cadmium in conjunction with tin was applied for and the patent granted in November of the same year.

No further effort was·made to secure a patent on the cadmium nickel combination after notice from Dupont that Camelyte containing nickel as one of its ingredients was an infringement on Cadalyte. Whether or not it was an infringement is not necessary to be determined as the defendant acquiesced in the claims of Dupont and promised to refrain from using nickel in their Camelyte.

The plating with cadmium alone produces a white coating or plate which is used largely as a rust preventative. In order to obtain a bright lustrous finish it is necessary to add to the cadmium what is termed in the evidence as a "brightener". The secret process of Camel's invention consists in the preparation of the brightener, the elements of which is either silver, nickel or tin. The use of silver does not seem to have been commercially used and appears to have dropped out of the picture

when the application of December 11, 1936, was abandoned. Nickel was abandoned after it became known that it was an infringement on the Dupont patents. The first commercial use of tin as a brightener by the defendant was in March 1937, and the first shipment of material to the Yankee Electroplate, Inc., was Camelyte containing tin.

The plaintiff, however, was unable to obtain the desired results from its use owing to the inexperience of its employees. Even after Camel had made several trips from Cleveland to the Rochester plant in an attempt to render assistance.

The fact that Camelyte contained tin and no nickel was made known to the plaintiff sometime prior to July 13, 1936. With this information at hand the plaintiff continued to do business with the. defendant, using the cadmium tin combination, until after Shockley became connected with the plaintiff.

I fail to find anywhere in the evidence any representation made by the defendant that a combination of cadmium and nickel was the one and only plating solution designated as Camelyte. In fact no representations were made as to the content of the secret process.

I find that the evidence fairly established that as early as the date of the conference at the Bradford Hotel in Boston, it was known to the plaintiff that Camelyte was in the process of development and that no patent had been obtained. Frank Sample, Jr., on his first visit to the plant in Cleveland was informed that the defendant was not sure that it had anything to sell.

The two companies worked along together, the defendant rendering such advice and assistance to the plaintiff as it could, in an effort to make the plaintiff's business a success and the plaintiff seeking almost daily advice as evidenced by the numerous letters between the parties and if the plaintiff failed to establish a lucrative business it was not the fault of the defendant, but due to its inexperience and lack of financial resources.

When the question came up of paying for the materials sent the plaintiff, the situation became acute and the plaintiff sought a reason for its failure and attributed it to the substitution of tin for nickel in the plat· ing bath which he learned for the first time from Shockley.

I find that the combination of cadmium with nickel was not discussed between Cam-

el and Sample and that Sample knew nothing of such a combination until after Shockley went to Rochester to work for the Yankee Electroplate.

After Shockley's arrival in Rochester he recommended the use of Cadalyte and they placed their first order for the same in the summer of 1937. Later in the spring of 1938 they contacted the Dupont people and placed orders with it for Cadalyte, using the same equipment which they have continued to use. For a time subsequent to Shockley's arrival they continued to advertise Camelyte although they were using Cadalyte.

The evidence does not disclose that Sample ever entered any complaint to the defendant concerning the materials shipped to him until after he had consulted counsel.

I find as a fact that prior to the date of the agreement and during the negotiations leading up to it, the defendant was using in its plant at Cleveland a brightener which contained nickel. This it continued to use until some time in March when it received notice from Dupont that Camelyte containing nickel was an infringement on Cadalyte.

There is nothing in the contract itself which signifies that the only patented solution called Camelyte contained nickel as a brightener although the plaintiff tries to make it so appear.

It is apparent from the testimony of Mr. Wesseler, patent attorney, that the term "Camelyte Process" at its inception was a method of producing a bright plate with lustre by the addition to cadmium of a brightener containing either silver, nickel or tin. So far as the result obtained there appears to be little difference between the use of nickel and the use of tin, except that greater care must be exercised in the use of the latter to avoid whiskery effect and the further fact that the tin solution plates out and has to be replenished oftener than nickel.

It is a fact, and I so find, that on the effective date of the contract only one application for a patent had been made. This was the application which is dated December 11, 1936, but the fact that the application referred to silver seems to have faded out of the picture and is not alleged as evidence of fraud in obtaining the contract.

■■ Fraud is never presumed. It must be established by clear and convincing evidence rather than inferences from circumstances. I fail to find any such evidence in this case. The plaintiff's misfortune is due to entering into a highly competitive business which requires skilled labor, without any experience, without adequate financial backing and incompetent help.

The plant has been moved from Rochester to Marlboro, Mass., and whether it will succeed with such aid as Shockley may give it is not a matter of importance in this case.

The plaintiff's allegations of fraud and misrepresentations are not sustained.

In the law action, the order is, verdict for defendant.

## DEFENDANT'S COUNTERCLAIMS.

It does not seem necessary to discuss the three counterclaims filed by the defendant more than to refer to the findings of fact and the rulings made with respect to the plaintiff's law action.

■ While the defendant was misled by the representations made by Frank Sample, Jr., as to the financial condition of the company which he proposed to organize and as to its ability to handle the New England franchise for Camelyte plating, I find that the Plating & Galvanizing Company was not damaged beyond the $500 received for the franchise.

■ The second counterclaim alleging unfair trade practices is not sustained.

The third counterclaim with reference to hiring away one of the defendant's key men and attempting to hire away others is fully covered in the facts above reported.

■ While it is true that the plaintiff hired Shockley, one of the defendant's key men, I find that it was done with full knowledge and assent of the defendant and did not result in any damage.

The defendant claims that the plaintiff owes the company the sum of $1826.32 for goods and merchandise purchased and delivered to the Yankee Electroplate, Inc.

I find that this allegation is sustained and a decree may be entered in the equity action in favor of the defendant and for the recovery of $1826.32.

■ As the plaintiff has abandoned the contract and the defendant has indicated no desire for its further continuance a decree may be entered rescinding the same.

Counsel may prepare and present a decree in accordance with this opinion.